RUSSELL *v.* BROOKS.

Opinion delivered November 15, 1909.

1. TRIAL—DIRECTING VERDICT.—Where, in replevin for a mule, plaintiff contends that the animal was procured from him by defendant's vendor by means of a fraudulent pretense, and there was evidence tending to sustain such contention, it was error to direct a verdict for defendants. (Page 516.)

2. FRAUD—HOW PROVED.—While fraud will not be presumed, and the burden is upon him who alleges it to prove same by clear and satisfactory evidence, still it need not be shown by direct or positive evidence, but may be proved by circumstances. (Page 517.)

3. SAME—RECOVERY OF PROPERTY—TENDER.—Where personal property is procured from the owner by a felonious act, or by a fraudulent pretense, his unqualified ownership is not changed, and he may recover it without tendering the consideration received by him. (Page 518.)

4. APPEAL—HARMLESS ERROR.—The exclusion of evidence is not ground for reversal where appellant fails to show what the excluded evidence was. (Page 518.)

Appeal from Pope Circuit Court; *J. Hugh Basham,* Judge; reversed.

STATEMENT BY THE COURT.

This is a suit by appellee to recover of appellants a certain mule. The complaint was in the usual form in replevin, and was against John M. Hatley. The appellants filed the following motion and answer:

"Come T. D. Brooks, A. S. Hays and J. M. Martin, and respectfully state that they are interested in the property sued for in this action, in this, that they were the sole owners of said property, and have possession thereof, and they allege that the defendant has no interest in said property. And they ask to be made parties defendant and substituted in the place of the defendant, Hatley. And, being so substituted, they deny that plaintiff owns said mule or is entitled to the possession thereof, and deny that he has been damaged in any sum whatever. Wherefore they pray to be substituted as defendants, that this be taken as their answer, plaintiff take nothing by his suit, and for other relief."

The testimony of appellee is substantially as follows: I live in Van Buren County. I am the owner of the mule in contro-

versy. On the 24th day of August, 1908, two men drove up to my house in a two-horse buggy about one o'clock and called for dinner. The older one of the two introduced himself as Dr. Warner of St. Louis. The younger man introduced himself as Mr. Bush. And spelled his name so I would not misunderstand it, B-U-S-H. While we were putting the team away, the young man proposed to buy a "nag" I had, and which was running in the yard. I told him I would sell her. They both came in and ate dinner. A few minutes before we went in the house, he (the young man) made mention about my looking so badly. I told him I had been in bad health. While they were eating dinner, the old doctor made mention that I was looking bad. I told him I had been under the weather, and had not worked any this summer at all. He asked what the complaint was. I said rheumatism. My wife asked me to have an examination. The doctor said, I will give you an examination, if you want me to, and not charge you anything for it. I told him I had no objection. So he gave me an examination. He pronounced me to be a pretty difficult case, and we talked on some bit, and he asked me about the case. I asked him if he thought he could cure me, and he said he could. He said he could cure me for $300, if I would go to St. Louis. I told him I did not have that much money. He said that is too bad. He said that he had four cases in this State to treat, one at Marshall, one at some other place, one on Bear Creek and one at Appleton. And they had paid him big to come over there and be their doctor. And he said he would give me the advantage of this, and that he would cure me here at my own home for $100. I told him I did not have the money, and he said: "You have some stock here that you can sell, haven't you?" I said, "Yes, but I have not got any money at this time of the year." My wife insisted that I take treatment any way. And he said: "What is a mule, compared with good health?" I said: "Of course, it is nothing much." So I consented to take his treatment. The young man (Bush) said he wanted the mule, but did not have the money in his pocket. He said I would have to wait on him or take a check or something until he could get to the railroad and get money. So I told the doctor that I would take his treatment if he could make it satisfactory with the young man to buy the nag. He had

proposed to buy her (a mare) when he first came up. The doctor said, "If you can make the deal with the young man, you can get the treatment." So I went and talked to this young man again, and he looked at the nag, and said she was older than he wanted. And asked if I did not have a young mule I could sell. I said I had one, but it was not there, and he said, "How long will it take to see her?" I told him it would not take a great while. He and I went and looked at her, and he remarked: "Bring her in; I guess we can trade." I brought her in, and there was not much more said between us until the next morning. They stayed all night. After breakfast the next morning the old doctor asked me if we had traded. I told him we had not closed any trade. He said, "Make up your mind what you are going to do." The young man and I went out to the lot, and he came in $3 of the price I had offered to take for the mule. I offered to take $125, and he offered me $122. And he said: "I have not got the cash to pay you the money now. But I can pay you part of it, twenty-two dollars, and the hundred you would have to pay the old doctor would make it." And he said: "I can pay him when I get to the railroad." He said: "I will wire and get a check and pay him." He gave me the twenty-two dollars in money, and he and the doctor took the mule. The doctor gave me in the presence of the young man (Bush) a written guaranty as follows:

"Scotland, Ark., Aug. 24, 1908.

"Received of W. H. Russell the sum of one hundred dollars for medical treatment. The same amount to be refunded if patient under treatment is not permanently cured in sixty days from date of this contract.                     Dr. B. R. Warner,

"St. Louis, Mo."

They came to my house on Sunday, August 24, during the same week I heard that they had been arrested. I took steps to get my mule back when I heard of this telephone cutting and their arrest. I heard of this on Wednesday of the same week. I went to Scotland and telephoned to the officers to hold the mule and party until I could get there. I came on to Russellville, and found my mule in the possession of John Hatley, sheriff of Pope County.

The doctor consented to the trade, and said he would take the young man for the one hundred dollars. The young man (Bush) told me that he first met up with the doctor at Marshall, who employed him to drive him to see these four patients and to bring him to Russellville. The young man (Bush) furthermore stated that he had taken him to see three of the patients, and had one more to go to see at Appleton, and from there they were coming on to Russellville. It was at Mr. Hatley's request that I brought this replevin suit, as he said he preferred me taking the mule according to law. I sold the mule to the young man. He gave me twenty-two dollars, and was to pay the doctor one hundred dollars. The doctor agreed to his. And said he would take the young man for the one hundred dollars. I do not know whether the doctor got the one hundred dollars or not. Don't think he could get it, as he never got to the railroad. I do not know whether or not the young man paid him. The doctor released me, and took Bush for the debt. As the doctor released me, it did not make any difference to me whether the young man paid him or not, if he had cured me. I gave him the mule for twenty-two dollars if he would pay the doctor one hundred dollars, and I took the receipt read in evidence to show that I had paid the doctor. When I came to Russellville to begin suit, Brooks, Hays and Martin told me that they had bought the mule from the young man (Bush). They made me a proposition, and said if I would pay back the twenty-two dollars and give them twenty-five dollars they would get the mule back if the young man would accept it. I don't remember of them ever offering to give up the mule if I would pay back the twenty-two dollars. I don't think any such offer was ever made. I have never paid back or offered to pay back the twenty-two dollars.

H. W. Russell testified in part as follows: "I was at the house of my son about the 24th of August on Sunday when the young man and the doctor were there. The old doctor talked about medicine with me almost all of the time, and said that doctoring had advanced to that stage that he did not have to doctor by symptoms any more. That he could tell what was the matter. He talked with the young man and advised with him about medicine. But said the young man did not actually help him with the doctoring. When they went to go to feed, the old

doctor asked my son if they had traded—meaning the young man (Bush) and my son. The young man answered and said that they had, provided that he (the old doctor) would wait until he got to Russellville, and the old doctor remarked that would be all right. The young man (Bush) told me that he was running a livery stable in Marshall, and that he was hauling him (the doctor) for $6.50 per day. And that he had a patient at Appleton that he was going to operate on for abscess on the liver. And that the old doctor had the money in the bank to insure a sure cure guarantied. The young man told me what the doctor had done and was going to do with the other cases. Said he had one on 'Big Flat' and another on 'Bear Creek,' and I believe he did tell me that he took three ribs out of one of them. I asked the young man, 'What if he does go in to cure my son and don't do it?' And he says that he gives a written guaranty to cure you. He says he does that all of the time. I asked him what it was, and he said he is rich, and I asked him what that amounted to if a man is here and he in St. Louis? The young man said that the doctor is a millionaire. The trade between the young man and my son was not made in my presence. The night these people stayed all night at my son's, they had a buggy which I cannot describe, and their team consisted of a sorrel and a bay horse."

Appellant offered the testimony of one P. H. Brandt as follows: "I live at Appleton, Pope County. On Monday, August 25, of this year, I saw two men in a two-horse buggy driving a bay horse, and I did not see the other horse good, and one of the horses was leading a mule. They were traveling so fast that I took both of them to be boys. They were traveling northwest as the road runs there. The mule was tied, and was leading abreast the off horse. Before we met I suppose I was seventy-five yards in front of them. I was walking, going home, and I heard a wire 'cling' as it broke and I noticed the wire dangling a short distance ahead of me and in a short distance I met this team and buggy coming meeting me. They came on and met me, and when they passed me I noticed where the wire was cut. It was fresh cut. They were traveling so fast I can hardly describe them, one was a young fellow and he was driving. The other was an older man, well dressed and had black

mustache. Looked to be forty-five or fifty years old. The mule looked to be a sorrel or bay, or a kind of a mouse color. This was between the 20th and 25th day of August, on Monday. They were driving very fast at an unusual rate. I heard the wire 'cling' and dingle and drop just before I saw them coming, but saw them immediately afterwards. I saw the young man they put in jail, but could not say that I recognized him to be the same young man. They were driving at an unsusual rate of speed for a two-horse buggy."

The court excluded the above testimony of Brandt, and to the ruling of the court in excluding it the appellant excepted.

Witness Hatley testified as follows: "I live in Russellville, Arkansas. During the month of August, 1908, my deputy arrested two parties near Dover. They were in possession of the mule here in controversy. They were arrested on one day, and I took possession of the buggy, horses and mule the next day. I got to Dover the next morning after they were arrested. They were arrested in the night about eleven o'clock. The mule was two years old, worth about hundred or hundred and twenty-five dollars. I had been informed that Brooks, Hays and Martin claimed the mule. I was holding the mule as sheriff of the county, and had put the boy in jail, and, not being satisfied with his conduct, I detained him for further investigation. And about that time a replevin suit was brought for the mule. This is a friendly suit, as far as I am concerned. I brought the buggy, team, mule and the young man all from Dover myself. I took charge of the mule, believing it to be stolen property. In fact, I thought the two horses, buggy and mule was all stolen property. There was no agreement between me and the boy whom I had in custody as to how long I would keep the property. Something was said by the boy about the price he was to pay, but I do not remember just what was said. I wanted to catch the other man (the old doctor). I never did part with possession of the mule before suit was brought. After suit was brought I turned the mule over to Brooks, Hays and Martin. But it is understood between us that I am still in possession of the mule, but in order to save expense to them I let them take it and put it in their pasture. They are to hold me harmless for any damage that might arise out of a wrongful delivery of the mule to them."

During the examination of the above witness he was asked: "What kind of baggage or property did you find in the buggy?" He answered, "I found a grip." He was asked: "What did it contain?" Counsel for appellees suggested that the question was immaterial. The court thereupon instructed the witness not to answer, and to this ruling of the court appellant excepted.

During the examination of the witness H. W. Russell he was asked: "Now, you came to Russellville and saw this young man in jail. Tell the jury what statements he made to you."

Appellees objected. The court sustained the objection, and appellant excepted to the court's ruling.

At the conclusion of the evidence the appellees moved the court to instruct the jury to return a verdict for them, which motion the court granted. To this ruling appellant duly excepted. The jury returned a verdict for appellees. Judgment was rendered for them. Appellant moved for a new trial, alleging as grounds the rulings of the court to which he had excepted. The motion was overruled, and this appeal was taken.

*U. L. Meade,* for appellant.

1. The fraud practiced upon appellant amounted to larceny, and he is entitled to recover the mule. No title passed from him to Bush and Warner. 14 Ark. 79, 82-3; 1 Wharton, Crim. Law, § 916; 48 Ark. 148; 72 Ark. 241; 63 Ark. 87.

2. Brandt's testimony was competent to go to the jury as a circumstance tending to prove fraud and the larceny of the mule. 24 Ark. 222; 29 Ark. 386; 42 Ark. 542; 47 Ark. 247; 68 Ark. 529; 38 Ark. 221.

3. Tender was not a prerequisite to maintaining replevin in this case. But, if it was a prerequisite, which is not conceded, appellees made it unnecessary, in that they advised him that they would not accept the $22, but demanded $25 more, a total of $47. 68 Ark. 505; 5 Cowen (N. Y.) 506; 10 Ia. 223; 5 Watts (Pa.) 509; 15 Me. 296. Had a tender been necessary, the court erred in directing a verdict for appellees. Kirby's Dig. § 6869; 65 Ark. 448; 33 Ark. 425.

*H. M. Jacoway* and *Sellers & Sellers,* for appellees.

1. Appellant got all he contracted for, and delivered the property intending to part with the title. Before he could retake

it, he would have to show that he was defrauded, and that at the time he brought the suit he had the right to rescind and sue. No fraud is shown, and it will not be presumed. 6 Enc. of Ev. 6; 11 *Id.* 566; *Id.* 259; 37 Ark. 145, 149; 45 Ark. 492; 63 Ark. 16, 22. There can be no rescission without first an offer to return all that had been received. 59 Ark. 259; 46 Ark. 245.

2. The testimony excluded was not legally admissible.

Wood, J., (after stating the facts.) Under our statute, one who obtains personal property from another by any false pretense, intending to defraud, upon conviction thereof, shall be deemed guilty of larceny. Sec. 1689, Kirby's Digest. See also 1 Wharton, Cr. Law, 916; 1 Bish. Cr. Law.

We are of the opinion that, when all the facts and circumstances disclosed by the evidence in this record are considered, it was a question of fact for a jury to say, under proper instructions, as to whether the two men mentioned had not entered into a conspiracy to defraud appellant by falsely pretending that the younger was a liveryman and driver for the elder, and that the elder was a doctor who could and would, for the consideration named, cure the appellant of the malady with which he was afflicted. It was a question for the jury as to whether these two men were making such fraudulent representations of existing or past facts, knowing same to be false, as were calculated to induce appellant to deliver to them his mule.

The facts are set out in detail, and they speak for themselves. The younger man represented that the elder was a doctor whom he had first met at Marshall. That he was employed by the doctor to furnish him conveyance to the four patients he had in this State. He represented the doctor as a millionaire who had the money in bank to insure a cure, that he had taken the doctor to see three of his patients, that he had taken three ribs out of one, was going to operate on another for abscess of the liver, and that all the time he gave a written guaranty. The elder man "talked about medicine all the time," and said "that doctoring had advanced to that stage that he did not have to doctor by symptoms any more, that he could tell what was the matter."

The appellant was so badly afflicted with rheumatism that he had not been able to work at all during the summer. The two men mentioned went to appellant's home, and through the above and other representations, as detailed in the statement, induced appellant to deliver to them his property upon the assurance that unless he was completely cured within sixty days the amount he had paid, the balance of the price of the mule surrendered should be returned to him. After they had thus obtained his property, they left his home Monday morning, August 25, and were soon thereafter arrested. The sheriff believed that not only the mule they had procured from appellant was stolen property, but also the two horses and the buggy in their possession. The young man was lodged in jail, the elder escaped. The sheriff "wanted to catch him," thus showing he had gone.

The testimony of Brandt should have gone to the jury for its consideration. It tended to show that on the day the two men left appellant's home Brandt met two men of the description of the two who had secured the mule from appellant. The mule they were leading answered the description of the mule taken. This testimony tended to show that these men were driving at an unusual speed, and were cutting the telephone wire as they went. If the men seen by Brandt were the men who had obtained appellant's mule, as this testimony tended to prove, the fact that they were cutting the telephone wire, and were driving at an unusual speed after doing so, were circumstances to be considered by the jury. Such circumstances, in connection with the other facts in proof, tended to show that the men were conscious of having committed the crime, and were endeavoring to make their escape. The testimony, because of a lack of more complete identity, was not of a very strongly criminatory nature, but it was a circumstance nevertheless tending to identify them and to show that they were conscious of having fraudulently deprived appellant of his mule, and were trying to cut off telephone connection. so as to enable them the more successfully to make their escape.

Without commenting more at length upon the testimony, it suffices to say that it was for the jury to say, from the nature of the representations themselves and the other circum-

stances in proof, as to whether such representations were made in good faith and for an honest purpose, or whether they were made to defraud appellant of his mule. While fraud will not be presumed, and while the burden is on him who alleges it to prove same by clear and satisfactory evidence, still it need not be shown by direct or positive evidence, but may be proved by circumstances. *Phelan* v. *Dalson,* 14 Ark. 79.

We do not consider the circumstances in this case so slight, and of such equivocal and unsatisfactory character as to warrant the court in taking the question of fraudulent pretenses from the jury. *Bank of Little Rock* v. *Frank,* 63 Ark. 16. It was for the jury to say whether an itinerant millionaire doctor of the "all cure or no pay" variety really existed in this case, and whether the representations which he and his boosting companion made of present and past facts were known by them at the time they made them to be false, and whether they made them for the felonious purpose of depriving appellant of his property.

The question of tender was not raised in the pleadings, and does not arise in case like this. Here the party who obtained possession of the mule from appellant had transferred same to third parties. These parties are being sued for the possession, and they set up ownership in their own right as innocent purchasers. They do not concede, but deny, that appellant is the owner. The only evidence in the record concerning this is by appellant who says: "They made me a proposition, and said if I would pay back the twenty-two dollars, and give them twenty-five dollars, they would get the mule back if the young man would accept it." Under such circumstances tender to appellees was not a condition precedent to the right to maintain the suit.

If "property has been obtained from the owner by a felonious act, his unqualified ownership is not in the least changed, and he may peaceably take it in whose hands soever he may find it." *Phelan* v. *Dalson, supra.*

The appellant did not offer to prove that the grip, found in possession of the two men when arrested, contained articles that would tend to show that the men had perpetrated a fraud on appellant in getting from him the mule. In the absence of

such offer by appellant, the ruling of the court in refusing to allow witness Hatley to testify as to the contents of the grip was not error.

The ruling of the court in excluding the declarations of the young man in jail was for the same reason correct.

For the error of the court in directing a verdict for the appellees the judgment is reversed, and the cause is remanded for new trial.

BATTLE and HART, JJ., dissent, on the ground that the court did not err in its ruling on the facts.